21-4098, Center for Biological Diversity v. Department of the Interior. And for the appellant is Mr. Snape. Did I say that correctly? Yes, sir. As a Timkovich, I'm used to getting it mangled. Thank you. You may please introduce yourself and you may proceed. Thank you, Mr. Chief Judge. Good morning. May it please the Court. My name is William Snape. I'm counsel for appellants, river, and wildlife protection groups. This case is about how one federal agency, the Department of the Interior's Bureau of Reclamation, cut a special and unfair water deal with the state of Utah that led to an arbitrary and capricious environmental assessment under NEPA. This environmental assessment entirely failed to consider the new normal of drought, heat, and lack of water availability on the Colorado River system, of which the Green River is a part. And it's not just conservation groups that warned and complained about this. It was the National Park Service, the Fish and Wildlife Service, and all of the expert evidence in the record indicate we are entering a new normal of water scarcity in the Colorado River. The best way to describe the agency's ignoring of this central fact is to look at the evidence that is in the record. The Colorado River Basin Plan. Well, isn't your argument, counsel, not so much that it was ignored, but that it wasn't adequately explained or contended with? Your Honor, I think both, but I think it's fair to say it was ignored. The agency, in its response to comments, points out to their technical appendix A, which is a hydrology modeling appendix that they did after their environmental assessment. And in that technical appendix, they do mention the term climate change, but they never take into account the concerns that the Park Service and the Fish and Wildlife Service had and never took into account that the recent studies indicated that upwards of 20 to 30 percent of the entire water in the basin could be gone by mid-century. Never was that key fact even stated in the appendix, not to mention analyzed or considered. And therefore, I think it is accurate to say it was ignored. It's a central fact. And that, under the precedent in this circuit, the Utahans for Better Transportation, that by itself makes this E-A-E-L-E. We're talking about an exchange contract here. The decision whether to enter into a contract with the state, and the state does have a right to this water, right? Under most scenarios, Utah has a right. It may or may not have to be still perfected. I understand that argument. But Utah is going to get this water if it jumps through the appropriate hoops. And whether they can eventually appropriate that water is going to depend on the water in the river and the other endangered species, minimum flows, and those sorts of things. Even if warming temperatures reduce the amount of precipitation in the Colorado River basin, Utah's rights can be subject to other senior rights and those sorts of things. So why is it a major problem that they localized the analysis here when the amount of water that they're going to be able to appropriate is going to be basically dependent on what's in the river and not what their right is? There are two answers to that question, Your Honor. The first, from a factual matter, is that the best scientific evidence in the record, the three expert studies that the agencies ignored, all said that the Green River Basin actually is going to suffer the same drought conditions that the rest of the system is going to suffer. Let's stipulate that there's going to be... Sure. And the second answer is the more legal answer, and you refer to it in your question, which is all that Utah has right now is a right to the apportionment. They must have a contract from the federal government to perfect that right, as you indicated. And we can disagree about what ultimately will happen with that water right, but we can agree that in this NEPA document, the no-action alternative and the action alternative, the only two alternatives that the agency considered were the same alternative. Both assumed that 58,000 acre-feet of water would be consumed, and that's not factually or legally accurate. They discounted the other... The Bureau discounted the other studies because they were basically system-wide, and their explanation was we're looking at a more localized regional effect. What's the... Why is that not a reasoned explanation of discounting those studies and relying on the research that they did? Well, first of all, Your Honor, the agency cherry-picks information from the Colorado River Basin Plan. On the one hand, they dismiss it because of the region-wide analysis from that plan. On the other hand, they use it to claim in their brief at page 23 that the Colorado River, the Green River System will see not a drought, but the three expert studies that we keep referring to, which start at appendix 365, 379, and 397, all say the opposite. All say that the upper basin is going to experience the same type of drought. The Green River is going to experience the same dryness and heatness and lack of water availability, and the agency never considered that. Didn't consider it in its alternatives. So is your argument that they didn't consider these studies... I thought your argument was that they didn't consider their own 2012 study, and their response, the Bureau's response is, well, that 2012 study applied to the entire geographic seven-state area, and we're talking about this specific area. And so, therefore, that wasn't really applicable. But I guess I'm not understanding. Are you suggesting they should have considered their own study, or that their own study didn't even consider the drought conditions? Thank you for that question, Your Honor. It's actually both. The EA assumes business as usual. The EA assumes an error of water abundance, as we saw in the 20th century in the 1990s. The Colorado River Basin Plan from 2012 estimates a 9% loss in water availability in the entire river system. The Overpeck, Udall, and McCabe studies increase that to 20% to 30% by mid-century, with as high numbers as 55% at the end of this century. Half of the water in the system may not be in the river at the end of this century. Nowhere in the EA does the agency reckon with this key fact. Nowhere. Can you go back to my question? Why does that matter? Why does whether the river's 10%, 20%, or 30% below what it is today, why would that drive a decision by the Bureau to reject or not to enter into this contract with these waters that Utah has a right to? Your Honor, because alternatives, robust, reasonable alternatives, are the heart of NEPA. And to have two alternatives that were the same, under each would assume that the same 58,000 acre-feet of water will be consumed, is not what NEPA requires. NEPA requires alternatives that are different. And in this case, realizing Utah has this apportionment, the agency, for instance, didn't look at a situation where maybe Utah would get some of the water now, and they'd wait to see about some of the other water later. I mean, we're in a crisis right now. Residents in Arizona are not getting their water. The National Park Service is concerned that not enough water is going through the parks. Lake Powell at a historic low. The Flaming Gorge Dam is actually releasing water right now for Lake Powell. That's how bad the system is. So the agency had to consider that reality as it was giving Utah really a special deal. The government, along those lines, I think the government's brief takes the position, and the EA takes the position, that the same amount of water is going to reach Reach 3 under the status quo, and equally true if they change the point of diversion to below the dam. Is that incorrect in your view, or is that correct? We think, Your Honor, that the agency completely fell down on Reach 3. The only reason why the agency in the record doesn't analyze the effects in Reach 3 is because they didn't have to analyze Reach 3 in a 2005 environmental impact statement for the Flaming Gorge Dam. The contracted issue here considers Reach 3 and says Reach 3 is important for the fish. The biological opinion in the record says Reach 3 is important for the fish. The Alamo studies, the Park Service says Reach 3. They said it doesn't matter because the same amount of water is reaching Reach 3. What's the flaw in that? Well, even the Utah Department of Water Resources wasn't sure that that's a correct assumption these days. That was an assumption based on 2000 water levels. The Utah Department of Water Resources in the record is not sure that the assumptions about Reach 2 mean that we don't have to worry about Reach 3 anymore. So your position is it's not a one-to-one swap of acre-feet here. Is that your position? That's right. This is water, even the State of Utah admits in their brief at page 17, this water's now not being used. This water's now in the river system, and under this action, the water's gone forever. That water will be consumed and used, and it won't be. The U-Tribe, a much senior water user, is at great risk here because of a junior water user getting this water in the fashion in which it did. And again, we're not, at the end of the road, we may disagree about water rights, but it infected the NEPA analysis. The NEPA analysis put the cart before the horse. It assumed that the contract must go forth and created flimsy analysis to support that flawed decision. That's what we argue, Your Honor. And the agency action here is the contract? It's both. It's both the contract and the finding of no significant impact that accompanied it. And we think the contract infected the environmental assessment and infected the analysis in a way that made it not robust, not accurate, and not scientific. And again, it's not just us. It's the Park Service and Fish and Wildlife Service, both the Utahns for better transportation, a precedent in this circuit, and two recent D.C. circuit decisions, the Semonite case and Standing Rock, all indicate when there's this level of dispute and acrimony among the agencies, that by itself is enough to remand it back to the agency and in this case require a full environmental impact statement. Why was this only in EA? I mean, this is a huge issue, and they did an EA tiering to 2,005 documents. They should have used all the updated information that was before them, and they didn't. Can you comment on what you perceive as the primary flaws in their use of the Trace 63 methodology? So, Your Honor, we understand that, in general, agencies with expertise get some deference on models. We're not going to argue that here. But the National Park Service, the Fish and Wildlife Service, all pointed out that in the past the agency had used multiple models. In the past, the agency would look at drought years. The model Trace 63 explicitly includes the wettest years we've seen in the last century, the 80s and the 90s. It did not take into account this new normal of heat, drought, and lack of water availability. So maybe Trace 63 is or is not a good trace, but why did they only use one trace? When did it become a surrogate? And why didn't they use a process as robust as they did before? If they'd done a fully IS, I think the modeling would have been more robust, and it isn't just us saying this. It is fellow agencies pointing out the problems with this modeling. If it's junk in, junk out, and we think putting so many wet years into the model... If they had used the 2012 study, would that satisfy your concerns? Halfway, Your Honor, because you still have to take into account the Overpeck, Udall, and McCabe studies that are five years after the 2012 study, all of which indicate the situation was even worse than the 2012 study indicated. We're going in the bad direction, not a good direction right now, and the agency pretended as though nothing was going on, even though a month before this contract, the Department of the Interior under Federal Register notice called the Colorado River situation a historic drought. But in the EA, you see none of that. It's all lip service to climate change, no real consideration of the dire straits of this river system. The government brief suggested that the 2012 study indicated that there may be an increase of precipitation in the upper reaches of the Green River at higher elevations. Why isn't that some reasoned basis for narrowing the scope of the geographical study? Well, Your Honor, the government itself admits that it did not take a really hard look at those three studies. In fact, those three studies, the Overpeck, Udall, and McCabe studies, all indicate the opposite. That the water, a lack of availability is going to hit the Green River system, is already hitting the Green River system, and the upper basin was not going to be immune from this drought. The agency did not consider those three studies. Those studies focused in on the precipitation. In the upper basin. Expected participation in the upper basin. Correct, Your Honor. Those studies conflict with what the Bureau used. Is that sufficient to question their explanation or their basis? Judge Morris, I would say two things about those three studies. I would say, number one, they build upon the Colorado River Basin Study. They are later in time and not inconsistent with that. The facts are now worse. Secondly, those three studies show that the upper basin is not immune from the drought the way the Colorado River Basin Plan of 2012 assumed. And no evidence in the record disputes these three expert studies. It seems to be the best. And it's happening. The upper basin is experiencing drought. So these three studies have been correct. And this was foreseeable in 2019. I'd like to, if I could, reserve rebuttal time. You may, Counselor. Thank you. Let's hear from the government. First is Mr. Arbab. Good morning, Your Honors. May it please the Court, I'm John Arbab for the Federal Appellees. I will argue for 10 minutes. With me at counsel table is Erin Middleton. She will argue for five minutes on behalf of the State of Utah. Your Honors, I think maybe the best way for me to start is to try to address a few of the questions that came up in the appellant's argument. I'd like to address the studies for a moment. The problem, as I believe Judge Timkovich and Moritz indicated, the problem with the Udall and Overpack and the two other studies that plaintiffs are relying on is that they take a much too large of a geographical look at this problem. Counsel mentioned that some of the studies address the upper basin. Well, that is correct. But the upper basin is a huge area. What we're talking about here is the Green River watershed, which I think of as kind of a subset of a much larger upper basin of the Colorado River. And the difficulty with these other studies is that they don't take a fine-grained approach to the area that we're talking about here, which is the area in which the exchange contract would be performed. Is there any study that takes a fine-grained look at the Green River watershed? Well, the reclamation thought that the best indication of that was its own 2012 study. And we cite in the brief where that 2012 study explains that although lower water availability is expected in the future in the lower basin. And why was that the best available data, though, at the time? Why was the 2012 study considered by you to be the best available? That is the one that focused on this area, on the specific geographical area, to the highest level of granularity. So we have to assume that in order for that study to be the best data, the narrowing of the geographic scope is the right approach? Yes, Your Honor. I think that's completely reasonable. The agency gets a lot of deference in terms of the modeling and the geographic area that it chooses for modeling. That goes all the way back to the Spring Court's decision in the Kleppe case back in 1976, I think. But isn't the challenge here to the adequacy of the explanation? It is, Your Honor. But I think that, again, in the response to comments and in the EA itself, the agency, I mean, it didn't go on at length about these other studies. It's true that it didn't mention Overbeck and the other two studies by name, but the same rationale that the agency did give for why we need to be looking at a much more geographically narrow area applies to those studies as well, because they suffered from the same basic flaw in trying to apply to map them onto the much smaller geographical area of the exchange contract. So I think the agency acted well within its discretion in the way it handled the modeling and the way it responded to the studies. Is Utah entitled to more water or the same amount of water after the approval of the exchange contract? Well, Your Honor, the exchange contract is sort of a wash in a sense, because the exchange contract is just in exchange for Utah's agreement not to deplete a certain amount of water from the Green River and its tributaries under its compact authority. In exchange for that, Reclamation is agreeing to release an equivalent amount of water from Flaming Gorge Reservoir. If in keeping with the operating procedures for the reservoir and dam. So really all that's changing is the timing and location of the same amount of water. I asked Mr. Snape if the same amount of water would reach 3, and I understood him to say no. What's your position? Your Honor, it reached 3. The way I think of it is that in the agency's modeling, the agency assumed that none of the water that's released will make it down a river. It will all be withdrawn from the river near where it falls into the river from Flaming Gorge Dam, what the agency called the worst case scenario. And even in that scenario, the agency determined that the effect on any of the reaches, 1, 2, or 3, would be minimal. And that in fact, the contract could prove beneficial to the fish in all reaches of the river, because it allows high time spring flows to stay in the tributaries and in the river and not to be depleted by the state of Utah. So I think the worst case scenario takes care of Reach 3 to the extent that it's an issue. But under the Environmental Impact Statement and Record of Decision for the Flaming Gorge operation that was done in 2006, as a matter of fact, the agency is only required to make sure that there's enough water in Reaches 1 and 2 for the endangered species. And that authority would trump the water user's rights to appropriate from the river. In other words, the endangered species creates a floor for the amount of water that can be taken from the river. Well, Your Honor, I think the answer to that is yes, in the sense that under the contract, Utah cannot call for any water to be released. The water would be released at the discretion of reclamation in keeping with the Record of Decision that governs operations of Flaming Gorge Dam. But in terms of Reach 3 itself, as I was indicating, the worst case scenario modeling that the agency did indicated that there would be no, there would be negligible effect on any of the reaches. And in fact, the contract could prove beneficial to the endangered species in the river, in the reaches below the dam. Does the agency believe there's going to be less water in the river above Reach 3? Is that the reclamation's current opinion, you know, because of drought conditions or warming temperatures? Your Honor, the agency found that in its modeling that even if all of the water, all of the water in the Green River block were removed from the river right at the, essentially at the base of the dam and never made it downstream, it would have only a minor impact. So that's the way the agency modeled for the potential effects of withdrawing the entire amount of water in the Green River block and found that the impact on this endangered fish would be negligible and could be beneficial. Hypothetically, what if the flows of the Green River were 30% below what they are estimated in the EA? What would, you know, what would be the impact on this exchange contract or on Utah's ability to divert water below the dam? Well, if that eventuality were to occur, the agency has discretion not to release the entire amount or I think any of the amount of the acre feet in the Green River block. As I mentioned, Utah cannot make a call on that water. It would only be in the river to the extent that the, that reclamation found it appropriate to release it from the reservoir in the first place. Is the river over-appropriated basically above Reach 3? I don't think so, Your Honor. That, certainly the EA does not indicate that. And again, this is not a study of the hydrology of the entire Green River. It's just focusing on this exchange where really the only thing that's different is that the timing and location of the diversions would be different under the contract. Can you focus on the no-action alternative in the argument? Yes, Your Honor. That is one of the other things I wanted to make sure to cover. The no-action alternative is not the same as the action alternative. And I would like to refer the Court to a couple of places in the record. The no-action alternative, there's a no-action scenario, which is specifically with regard to hydrology. Appendix Volume 2 at 189. This no-action scenario specifically says that GRB depletions, meaning Green River block depletions, were assumed to be zero for the entire model run. That means none of the water in this block is depleted under the no-action alternative. And in the EA, the no-action alternative itself is the same. And this is at Appendix Volume 2 at 190 and Federal Supplemental Appendix Volume 1 at 36 and 42. The no-action alternative explains that the State would remain free to develop their apportioned water right under the 1996 assignment without the stability of Flaming Gorge stored water being released. So, again, the assumption is that under the no-action alternative, none of this block of water would be released. So that is clearly different from the action alternative, where the water would be released from Flaming Gorge. Your Honor, I see that I'm beyond my time. Yes, let's hear from Ms. Middleton. Yes, thank you very much. Thank you, Your Honors. May it please the Court, Aaron Middleton on behalf of the State of Utah and the Utah Board of Water Resources. I just want to address a couple of points related to the State's interest. First, this case is not about a new appropriation of water. Utah has a water right for the amount of water in the Green River Block that it has had since 1996. This contract didn't give Utah the right to any more water than it already had. Can it use the water without Reclamation's approval? Yes, Utah can develop the water without Reclamation's approval. Utah perfects water not by getting approval with Reclamation. Perfection is a state process where an application is filed with our state engineer to decide how to put that water to use. There's nothing in federal law that requires Utah to obtain Reclamation's approval to develop its water rights. There are several authorities cited in the reply brief for that proposition, but they govern lower basin states, and Utah is an upper basin state, so California versus Arizona. The Boulder Canyon Project Act applied a lower basin water. Upper basin water is governed by the compacts, the Colorado Compact and the Upper Basin Compact. Nothing in those requires us to get Reclamation's approval to develop our water right. Utah has a water right. It had it before the exchange agreement. It has it after the exchange agreement, and it can put that water to use now just as it could before. In fact, it already has put 13,000 acre feet or a little more than that to use before we ever entered into this exchange agreement. Going to the questions about if the water is over-appropriated or if there's not enough, this isn't really the action to decide that. For one, the agreement contemplates a one-to-one exchange. Utah has agreed that when it develops its right, it's going to take water from the releases. In exchange, it will not exercise the right it had to develop that water from the tributaries, so it will leave the same amount of water in the tributaries as it will take from the release. It really has just changed. Instead of taking water from the tributaries, it will now take from the release, but the net amount of water is the same. If for some reason there were not enough water, our state engineer has a process to deal with that, which governs rights that are first in time get first priority. If there were too many water rights users on the Colorado system that couldn't take because of changing conditions with drought, then those water users that have priority would get the water first. In this case, the water right that Utah has, it was assigned to Utah in 1996, but it actually has a 1958 priority date. Utah's water right would take precedent over any junior water users past that. If there weren't enough water, it would be those water users whose right might have to not be taken out of the river. To address another point with respect to the tribe's rights, this agreement has no effect on those rights because it didn't change anybody's priority. This right also is junior to more senior rights and would not affect, if there's not enough water for all of the rights, the more senior rights would trump even Utah's right in this case. A final point is that any challenges to the effects that the specific diversions will have are premature. Once Utah enters into contracts to develop this right, those users will have to file change applications with our state engineer that detail why they're going to use the water, where they're going to take the water, how much, and protests can be filed at that point to raise concerns about the effects that that specific diversion will have on the river. For these reasons, the state would ask this court to affirm. Thank you. Thank you, counsel. There's some rebuttal time. Paul, could you give them one minute, please? Yes, sir. Thank you, your honors. There were a lot of things said just recently that I do not believe are legally accurate, but I want to focus in on what I think is the central problem in this environmental analysis, which they are putting on goggles, lenses, and looking at a small part of this river and claiming they don't need to look at the other part of the river, that the river at this point is interconnected. The compacts say that the upper basin and lower basin are interconnected. The agency behaves with releases from Cliff Flaming Gorge for Lake Powell as though they're interconnected. And let me just read to you what the National Park Service and Fish and Wildlife Service said to BUREC, and BUREC never took this into account. Clearly, Utah's development of the proportioned water under the 1996 assignment without replacement water would affect the current hydrology of the Green River. That's on Appendix 256 by the Fish and Wildlife Service. The Park Service on Appendix 297, one very important concern we have regarding hydrology modeling is the lack of evaluation of a drier scenario. After 19 years of drought in this system, there is growing consensus among partners and scientific studies about the new normal, maybe warmer and drier years on average. Nowhere did the agency take this into account. It is why their environmental assessment is fatally flawed. They need to go back and do it over again. You know, just contextually, how much water are we talking about here? Is it a bucket in a swimming pool or half the pool? Kind of give us a sense of what we're talking about. It's almost 60,000 acre-feet of water annually, which can supply about 80,000 homes for a year with water. It is a heck of a lot of water, Your Honor, and the system needs it right now. All right, counsel, thank you. Appreciate your arguments. Counsel are excused, and the case will be submitted.